**UNITED STATES of America, Appellee,**

v.

**Alan C. SOLOMON, Defendant-Appellant.**

**No. 514, Docket 74–2316.**

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1974.

Decided Jan. 14, 1975.

---

Arthur B. Kramer, New York City (Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, and Harold P. Weinberger, New York City, of counsel), for defendant-appellant.

Daniel J. Beller, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., and John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

In mid-April 1973 Arthur Levine and Sol Leit, the chairman and president of Weis Securities, Inc. (Weis), a brokerage and investment banking firm which was a member of the New York Stock Exchange (NYSE), notified the Exchange that the firm was in financial difficulty and that there might have been certain "bookkeeping inadequacies" which had resulted in an understatement by as much as $2.5 million of its reported operating losses over the prior several months. Despite the officers', urging that NYSE refrain, at least temporarily, from sending in examiners, NYSE commenced a full investigation on the following day. During the next two weeks, a number of financial irregularities were discovered in Weis' accounts, including an understatement of losses and bank loans. In accordance with its statutory duty, NYSE advised the Securities and Exchange Commission (SEC) of the probable violations of its rules and regulations and began transmitting, on an almost daily basis, reports containing the

results of its investigatory activities and contemplated actions.

On May 17, Alan C. Solomon, who as a Weis officer and director was an allied member of NYSE, was summoned to appear before the Department of Member Firms and testify. Article XIV of NYSE's Constitution provided:

> Whenever it is adjudged in a proceeding under this Article that a member, allied member or approved person has been required by the Board or any committee, officer or employee of the Exchange authorized thereby . . . to furnish information to or to appear and testify before or to cause any such employee to appear and testify before the Board or any such committee, officer, or employee and has refused or failed to comply with such requirement, such member or allied member may be suspended or expelled and such approved person may have his approval withdrawn.

Accompanied by his then counsel, Solomon appeared and was questioned at some length, first off the record and then on the record. The chief interrogator was Dennis Pape, special counsel to NYSE. According to an affidavit by Solomon, he "was aware of the provisions of Article XIV of the New York Stock Exchange Constitution which empowered the Exchange to suspend me if I refused to cooperate and answer all the questions put to me during the May 17th interrogation." He averred also that "Mr. Pape and his cohorts in the off-the-record discussions which preceded their formal interrogation, also reminded me of the sanction of suspension which would be imposed if I did not testify." [1] Under questioning Solomon admitted that he had originated the idea of seeking to create an appearance of a better financial situation for Weis by "taking a

position in Pan American convertible bonds 4½'s 1986, which were selling at around 52, and misevaluating them as Pan Am's 4½'s 1984, which were selling around 80." [2]

Two days prior to Solomon's testimony before the Department of Member Firms, the SEC entered an order of investigation and on May 16 served a subpoena requiring NYSE to turn over all material developed in its investigation. NYSE immediately submitted depositions already taken; considering the subpoena to be a continuing one, it later furnished Solomon's. On a complaint by the SEC alleging that Weis did not have sufficient capital under the Securities Exchange Act and the implementing rules of the Commission and NYSE and had been filing false financial reports with both bodies in an effort to conceal this, Weis was placed in receivership at the end of May by the District Court for the Southern District of New York. That action was followed in July by an eighteen count indictment, in the same court, of five of Weis' officers and directors, including Solomon.

The indictment charged in part [3] a conspiracy to violate and a number of substantive violations of the recordkeeping and reporting regulations promulgated by the SEC under § 17(a) of the Securities Exchange Act, 17 C.F.R. §§ 240.-17a–3, 5. Each of the other defendants pleaded guilty to at least one substantive count and three to the conspiracy count as well. After a bench trial on stipulated facts which included a transcript of his deposition before the Department of Member Firms, Solomon was found guilty on one substantive count of creating and maintaining false books and records. With the Government's agreement the other counts were dismissed with prejudice. The judge placed him

---

1. The warning given by Mr. Pape at the beginning of the on-the-record interrogation mentioned suspension or expulsion only in the context of a misstatement upon a material point.

2. As a result of this misrepresentation, the reported worth of Weis' unrealized income was inflated by approximately $200,000.

3. Certain of the defendants were also charged with mail fraud, 18 U.S.C. §§ 1341, 1342, unlawful use of the mails to commit a fraud in the sale of securities, 15 U.S.C. §§ 78j(b), 78f(f), 17 C.F.R. § 240.10–b(5); 18 U.S.C. § 2, and wilful affirmance of false financial statements which had been filed with the SEC, 15. U.S.C. §§ 78q(a), 78f(f), 17 C.F.R. § 240.17a–5.

on a supervised probation program for a year and imposed a $5,000 fine.

The sole point on appeal is the use, both before the grand jury and at trial, of Solomon's self-incriminating testimony to the Department of Member Firms, allegedly in violation of *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The complete deposition containing his admissions had been presented to the grand jury and constituted an important basis for the indictment. Solomon's present counsel moved to dismiss the indictment and to suppress use of the testimony or any of its fruits at trial. The judge denied the motion both before and again after an evidentiary hearing. After the conviction he denied a motion for reargument based on the rationale of this court's opinion in *United States ex rel. Sanney v. Montanye*, 500 F.2d 411 (2 Cir. 1974). Reiterating these contentions, Solomon again claims that the indictment should have been dismissed since the allegedly tainted testimony is claimed to have been the only evidence before the grand jury on the count on which he was convicted; alternatively he seeks a reversal and remand for a hearing to determine whether the Government possesses sufficient evidence not derived directly or derivatively through investigation from the deposition testimony to justify a retrial, *see generally* Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli, 82 Yale L.J. 171 (1972). We do not reach the question of remedy since we find no taint.

## I.

■ The United States suggests, in an elaborate footnote to its brief, that we could affirm without reaching the question whether interrogation by NYSE is

to be deemed governmental action. The most appealing basis asserted is the lack of any evidence that Solomon claimed his privilege against self-incrimination. Even when the inquiry is by a body having power to compel testimony, the rule is "that when an *ordinary witness* is on the stand and an incriminating fact, relevant to the issue, is desired to be proved through him, the question may be asked, and it is for him then to say, in terms which the court may reasonably be expected to understand to be a claim of privilege, that he will exercise the option given him by the law", 8 Wigmore, Evidence § 2268 at 402 (McNaughton rev. 1961) (emphasis in original); *per contra* with respect to the accused in a criminal case, *id.* at 406. The former principle, which governs a witness before a grand jury, *id.* at 403 n.2, O'Connell v. United States, 40 F.2d 201, 205 (2 Cir. 1930), cert. pet. dis. per stip. of counsel, 296 U.S. 667 (1936); United States v. Cefalu, 338 F.2d 582, 584 (7 Cir. 1964), or a Congressional investigating committee, Hutcheson v. United States, 369 U.S. 599, 619, 82 S.Ct. 1005, 8 L.Ed.2d 127 (1962), would seem clearly applicable here. When Solomon appeared before the Department of Member Firms he was a subject of investigation for possible future NYSE disciplinary proceedings, not a person accused of crime.

The first problem with taking this smooth road to affirmance is that except for a possible ground of distinction noted below the same reasoning would have led to a result in *Garrity* opposite to that reached by the Supreme Court. There the New Jersey Deputy Attorney General had advised the defendants, who at the time were still only unindicted witnesses, of the privilege, but had added that this was "limited to the extent that you as a police officer once sworn and asked questions pertaining to your office and your conduct therein, if you refuse to answer, you may then be subject to a proceeding to have you removed from the department." [4] State v. Naglee, 44

---

4. In fact the applicable New Jersey statute used the word "shall" rather than "may". N.J.Rev.Stat. § 2A:81–17.1 quoted in 385 U.S. at 494–495 n.1, 87 S.Ct. 616.

N.J. 209, 212, 207 A.2d 689, 693 (1965) (emphasis deleted); the officers then proceeded to answer without protest. Although the State's brief before the Supreme Court did not argue the point that appellants had not claimed their privilege, the Court was surely aware of the usual necessity for this in the case of an ordinary witness. Insofar as the decision rested on a violation of the privilege, the Court evidently considered an exception to that principle to be required when invocation of the privilege was clogged by *certain* forfeiture of office and pension rights and permanent disability from future state employment. The instant case arguably differs on this score in that Article XIV of the NYSE allows more latitude with respect to the certainty and dimension of the consequences triggered by a refusal to testify than did the New Jersey statute. Article XIV is addressed to all kinds of refusals; conceivably the Exchange would not impose suspension, at least of long duration, or expulsion, on a witness who based a refusal to answer on a not implausible, although erroneous, claim of self-incrimination.[5] Furthermore it is not clear whether *Garrity* rests on violation of the privilege or on the basis that the statements "were involuntary as a matter of fact", or on both. *See* 385 U.S. at 501, 87 S.Ct. at 621. (Harlan, J., dissenting).[6] Insofar as it rests on the involuntary nature of the statements, a view strengthened by the opinion's heavy reliance on Union Pacific R.R. v. Public Service Commission of Missouri, 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131 (1918), the argument here considered would be inapplicable, since in such cases objection at the time is scarcely realistic and the point is sufficiently preserved by a motion to suppress. We thus prefer to place decision on the basic ground that interrogation by the New York Stock Exchange in carrying out its own legitimate investigatory purposes does not trigger the privilege against self-incrimination or, at least under the circumstances here, render Solomon's statement involuntary.

## II.

Most of the provisions of the Fifth Amendment, in which the self-incrimination clause is embedded, are incapable of violation by anyone except government in the narrowest sense. No private body, however close its affiliations with the government, can hold a person "to answer for a capital or otherwise infamous crime" without an indictment, or subject a person "for the same offense to be twice put in jeopardy of life or limb." No one can take property for public use except the government or a person on whom the government has expressly bestowed that power. Solomon argues, however, that the remaining provision of the Fifth Amendment, the due process clause, has been extended in some instances to action by private persons having certain types of connection with the government, *see, e.g.*, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); that NYSE has close connections with the government; and that the self-incrimination clause as explicated in *Garrity* should therefore apply.

■ There is no need for us to add to the extensive discussion of the history of the privilege against self-incrimination in 8 Wigmore, Evidence § 2250, and Professor Leonard W. Levy's The Origins of the Fifth Amendment (1968). Whatever differences in the precise details of its

---

5. Solomon treats the case as if he were threatened with permanent loss of employment in the only business which he knew. We see no basis for concluding that Solomon was faced with consequences for refusal to testify alone as certain and drastic as were the officers in *Garrity*. Solomon's doubtless correct belief that he was faced with a serious penalty could have derived rather from his own knowledge of the enormity of his misconduct and the near certainty that this would be discovered or, indeed, already had been as the result of the prior testimony of other officers of Weis.

6. Lefkowitz v. Turley, 414 U.S. 70, 79–82, 94 S.Ct. 316, 38 L.Ed.2d 183 (1973), treats *Garrity* as resting on the privilege against self-incrimination.

origin and historic scope may exist among scholars, there can be no doubt that the privilege was in large part developed to protect the individual in what was thought to be an unequal contest with the state. The Supreme Court has frequently referred to Wigmore's statement, 8 Evidence § 2251 at 317:

The privilege contributes toward a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load.

Murphy v. Waterfront Commission, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1968); Tehan v. United States ex rel. Shott, 382 U.S. 406, 415, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). The Court has also said that the origin and history of the Fourth Amendment "clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies . . .", Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). Relying in part on that statement and the fact that *Burdeau* itself dismissed a self-incrimination claim, we have held the same to be true of the self-incrimination clause of the Fifth, in the context, quite pertinent here, of the application of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to interrogation by private security guards at a pier. United States v. Antonelli, 434 F.2d 335 (2 Cir. 1970). *Accord* United States v. Birnstihl, 441 F.2d 368 (9 Cir. 1971) (per curiam) (store security officer); United States v. Bolden, 461 F.2d 998 (8 Cir. 1972) (per curiam) (same); United States v. Casteel, 476 F.2d 152 (10 Cir. 1973) (employees of private security firm). *Cf.* United States v. Beasly, 485 F.2d 60 (10 Cir. 1973), cert. denied, 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed. 292 (1974) (4th Amendment inapplicable to private search); United States v. Echols, 477 F.2d 37 (8 Cir.

1973), cert. denied, 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973) (same); United States v. Ogden, 485 F.2d 536 (9 Cir. 1973), cert. denied, 416 U.S. 987, 94 S.Ct. 2392, 40 L.Ed.2d 764 (1974) (same).

Solomon argues that despite all this, interrogation by NYSE must be deemed the equivalent of interrogation by the United States because the Exchange has become in effect the arm of the Government in administering portions of the Securities Exchange Act. He relies on various provisions of the Act, such as the reporting requirements of § 17(a) and the regulations thereunder and the many other powers over exchanges and their members conferred on the SEC by § 19(a), (b), *see* Gordon v. New York Stock Exchange, Inc., 498 F.2d 1303, 1306–1307 (2 Cir.), cert. granted, 419 U.S. 1018, 95 S.Ct. 491, 42 L.Ed.2d 291 (1974). *See generally* 1 Loss Securities Regulation 130–31 (2d ed. 1961).[7] Particular emphasis is placed on Silver v. New York Stock Exchange, 373 U.S. 341, 350–353, 83 S.Ct. 1246, 1254, 10 L.Ed.2d 389 (1963), where, after discussing the proved inadequacies of "ungoverned self-regulation" by the exchanges and the consequent need for government supervision, the Court said:

The pattern of governmental entry, however, was by no means one of total displacement of the exchanges' traditional process of self-regulation. The intention was rather, as Mr. Justice Douglas said, while Chairman of the S.E.C., one of "letting the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used." Douglas, Democracy and Finance (Allen ed. 1940), 82. Thus the Senate Committee Report stressed that "the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary

---

7. *See also* § 6 (NYSE registration with SEC); §§ 9(a); 11; 17(a) (SEC regulation of NYSE members); § 12(d) (delisting by NYSE only after application to SEC).

affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S.Rep. No. 792, *supra*, at 13. The House Committee Report added the hope that the bill would give the exchanges sufficient power to reform themselves without intervention by the Commission. H.R.Rep. No. 1383, *supra*, at 15. See also 2 Loss, Securities Regulation (2d ed. 1961), 1175–1178, 1180–1182.

Thus arose the federally mandated duty of self-policing by exchanges.

Solomon misconceives the thrust of the Act and the Court's discussion of it. The exchanges' "traditional process of self-regulation" was not displaced. *See* H.R. Rep. No. 1383, 73d Cong., 2d Sess. 15 (1934); S.Rep. No. 792, 73d Cong., 2d Sess. 13 (1934) (stressing the broad responsibility left with the exchanges to administer their own affairs). Rather the SEC was given the power and the duty to make sure that the responsibility was diligently and effectively used. *See* Gordon v. New York Stock Exchange, *supra*, 498 F.2d at 1306–1307, and sources cited therein. NYSE's inquiry into Weis was in pursuance of its own interests and obligations, not as an agent of the SEC. It is not enough to create an agency relationship that Solomon's conduct violated both a rule of NYSE, thereby subjecting him to disciplinary action by that body, and federal law, with consequent liability to civil and criminal enforcement proceedings by the Government.[8]

Our conclusion is reinforced by two other related considerations. One is that we see no principled basis whereby acceptance of Solomon's argument could be confined to interrogation by stock exchanges; this is but one of many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes. Under the Commodity Exchange Act, § 5, 7 U.S.C. § 7, boards of trade have self-policing functions quite similar to those of stock exchanges under the Securities Exchange Act. Airline and steamship conferences have elaborate enforcement machinery to bring to light the charging of less than prescribed rates, the payment of more than agreed commissions to travel and freight agents, or violations of any of the many other regulations concerning the conduct of their members.[9] Whether or not the agreements provide explicitly for suspension or expulsion for refusal to furnish needed records or testimony, a member is aware that any such refusal will likely involve this or some other heavy penalty and will have methods of making this known to refractory employees.[10] One purpose of the

---

**8.** Compare the problems of state-federal relations decided in United States v. Coppola, 281 F.2d 340 (2 Cir. 1960) (en banc), aff'd, 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961) (per curiam), and Cleary v. Bolger, 371 U.S. 392, 399–401, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963).

**9.** For a description of the International Air Transport Association structure and enforcement machinery *see* Gazdik, Rate Making and the IATA Traffic Conferences, 16 J.Air L. & Com. 298 (1949); Hearings Before the Anti-Trust Subcomm. of the Comm. on the Judiciary, 84th Cong.2d Sess. 1072–83 (1955) (prepared statement of IATA Director). *See also* Bebchick, The International Air Transport Association and the Civil Aeronautics Board, 25 J.Air L. & Com. 8–13 (1958); Koffler, IATA: Its Structure—A Critical Review, 32 J.Air L. & Com. 222, 224–25 (1966). Compare Kharasch, Conferences of Carriers by Sea: Free-dom of Rate Fixing, 23 J.Air L. & Com. 287 (1956) (analysis of International Maritime Shipping Conferences in contrast with IATA).

**10.** The large number of different maritime agreements creating conferences which have been approved by the Maritime Commission, or by its predecessor body, pursuant to § 15 of the Shipping Act of 1916, as amended, 46 U.S.C. § 814, are not susceptible to generalization with respect to the specific sanctions that may be invoked by the conferences. However, one commentator has noted that the agreements concerning rates almost always provide for strict compliance enforced by a system of fines or potential expulsion. Kharasch, *supra* note 9, at 296. Any sanctions provided by the conferences reinforce the enforcement mechanisms provided directly under the Shipping Act to induce carriers and shippers to adhere to published tariffs

provision of the Elkins Act, 32 Stat. 847 (1903), as amended, 49 U.S.C. § 41(2), imposing criminal liability on shippers and carriers for railroad rebates resulting from "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier, or shipper, acting within the scope of his employment" was surely to enlist the aid of the carriers and shippers in policing their employees; clearly a refusal to answer an employer's questions about a rebate on the ground of self-incrimination would lead to discharge, and an employee discharged on that account would be unlikely to gain employment elsewhere in the industry at least for some time. We cite these only as examples that come readily to mind; there would be a complete breakdown in the regulation of many areas of business if employers did not carry most of the load of keeping their employees in line and have the sanction of discharge for refusal to answer what is essential to that end.

The other consideration is that Solomon's argument would in effect vest the stock exchanges, and many other similar bodies, such as those we have just mentioned, with the power to grant use immunity in circumstances where refusal to testify entailed a potential loss of employment or some similar economic harm. The SEC can grant this in its own investigations only if it concludes that the testimony or other information sought to be compelled may be necessary to the public interest and the individual has refused or is likely to refuse to testify or provide the other information because of his privilege against self-incrimination. Yet acceptance of Solomon's position would mean that a large number of private bodies have been unwittingly endowed with a power to grant exactly such immunity, compare Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 98 L.Ed. 608 (1954), without any weighing of the need for the evidence against the undesirability of conferring an immunity which goes beyond the testimony or information itself, and without the supervision of the Attorney General to which even government agencies are subjected. Since this would clearly be intolerable, the only possible responses in the situation here at issue would be for the SEC to order the exchanges not to ask any questions involving the slightest risk of exposure of crime or the abandonment of the only effective sanction possessed by a private body not endowed with the power to compel testimony. The unattractiveness of either solution suggests to us that *Garrity's* interpretation of the privilege applies only when the interrogator has the power to compel testimony against which the privilege

---

and not engage in rebates or other prohibited practices. *See* 46 U.S.C. § 812 (rebates); § 815 (discriminatory practices); § 817 (carriers in interstate commerce to establish, observe, and enforce just and reasonable rates and regulations; carriers in foreign commerce to file and adhere to tariffs of rates and charges); § 831 (civil and criminal penalties).

The International Air Transport Association Articles of Association provide for termination of membership by the Executive Committee for breaches of the articles, or regulations adopted pursuant thereto, or for failure to comply with any procedures adopted to deal with breaches of Traffic Conference action. Art. V. The Traffic Conferences, which enjoy considerable autonomy within the framework established by General Association meetings, are charged with the responsibility of developing agreements relating to traffic and operational procedure, conditions of carriage, and fixing of fares and rates. Under the IATA Traffic Conference Regulations, complaints concerning alleged violations of Conference rules and obligations are filed with the Director General, who may direct the IATA Compliance Office to undertake an investigation. Provisions for the Regulation and Conduct of the IATA Traffic Conferences XII-1(a)5. When pursuing such an investigation, the regulations further provide that IATA members must give the Compliance Office "adequate and full opportunity to interview and obtain information and records from any officer or employee of such Member" who is believed to have information pertinent to the investigation. *Id.* XII-6. Members found guilty of violations of any Conference regulations are currently subject to penalties which include reprimand, fines, or expulsion. *Id.* XII-14; Resolution IV of the 5th AGM. For the complete text of the Articles of Association and the Traffic Conference Regulations, see A. Lowenfeld, *Aviation Law* 279–310 (Doc.Supp.1972).

would be a shield and the state has sought to shatter the shield by the threat that raising it will involve consequences as devastating as in that case.

We find no basis for a different conclusion in the many "state action" cases in wholly different contexts cited by Solomon's counsel. Analysis of the particular constitutional provision at issue must be among the first, if not the very first, step in the process of "sifting facts and weighing circumstances" needed to attribute "true significance" to "the nonobvious involvement of the State in private conduct" dictated by Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 722, 81 S.Ct. at 860. It is one thing to say that the exclusion of blacks is no more permissible for a restaurant which is a lessee of a state parking authority than it would be for the authority itself; it would be altogether different to say that a lease of state property carries the privilege against self-incrimination on its back. Nothing in *Burton* remotely suggests that if the proprietor of the Eagle Coffee Shoppe had interrogated a waiter suspected of snatching a patron's purse, under the same kind of threat that refusal to answer would lead to discharge and a report to a restaurant trade association as would be made by other employers, the answer could not be used in evidence at a criminal trial. We need not here decide whether stock exchanges may be subject to some due process requirements for certain types of action as stated in dictum in Intercontinental Industries, Inc. v. American Stock Exchange, 452 F.2d 935, 941 (5 Cir. 1971), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972) (delisting of corporation's stock), Crimmins v. American Stock Exchange, Inc., 346 F.Supp. 1256, 1259 (S.D.N.Y.1972) (disciplinary hearing), and Villani v. New York Stock Exchange, 348 F.Supp. 1185, 1188 n.1 (S.D. N.Y.1972), aff'm sub nom. Sloan v. New York Stock Exchange, 489 F.2d 1 (2 Cir.

1973) (same), although the recent decision in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), would suggest the need for some caution on this score. We deal here with special factors concerning the privilege against self-incrimination and, although we do not think this decisive, even with that only in a preliminary investigation rather than a formal disciplinary proceeding.

### III.

There remains for consideration the ground of involuntariness on which *Garrity* may have been rested. This interpretation of *Garrity* seems to have been accepted in United States ex rel. Sanney v. Montanye, *supra*, 500 F.2d 411, although the majority there held that the economic threat to Sanney—discharge from a job as driver's assistant which he had held for one or two days—was not sufficiently serious to bring the case within the *Garrity* doctrine. Compare Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 183 (1973). Both *Garrity* and *Sanney* are distinguishable from this case. In *Garrity* there was clearly government action. Similarly, the *Sanney* court found that the private employer was "admittedly acting as an agent for the police". While it therefore could perceive no consequence from the fact that the coercive threat was conveyed in that manner "rather than through a person on the public payroll", it repeatedly stressed that government action was involved, 500 F.2d at 415.[11] Here, as we have concluded above, it was not.

■ It is settled law that the common law rule excluding confessions induced by a threat is limited to inducement by "a person in authority"; what is generally required is "a legal interest in the prosecution" and "not the mere existence of actual control or influence growing out of the social or commercial relations

---

11. *E.g.*, "The controlling factor is . . . the fact that the state has involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement. . . . The state's involvement is no less real for having been indirect and no less impermissible for having been concealed. The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect." 500 F.2d at 415.

of the persons." 3 Wigmore, Evidence, § 829 at 443 (Chadbourn rev. 1970). There is more debate about what "a legal interest in the prosecution" means. Under the leading English case a master or mistress is deemed "a person in authority" for purposes of the rule excluding involuntary confessions when and only when the offense concerns him or her. R. v. Moore, 2 Den.C.C. 522 (1852). In United States v. Stone, 8 F. 232, 254–262 (C.C.W.D.Tenn.1881), the court refused to go even that far, reasoning that the exception made in England was based on the common law requirement that some person be named as prosecutor whereas "the district attorney is the only prosecutor known to our law." Most American courts have opted for a "middle way" in which "[t]he injured person, or the master of a servant, is not regarded as necessarily having a control sufficient to vitiate confessions made by his inducement . . ." and "[e]ach case is decided upon its own circumstances, and the actual state of the relation between him [the master] and the confessor is inquired into with reference to the probable strength of the inducement", 3 Wigmore, *supra* § 830 at 446–47 and cases cited in n.5. *See, e.g.*, People v. Brown, 198 Cal.App.2d 253, 255, 17 Cal. Rptr. 884, 885 (D.C.A. 1st D.1961); State v. Hess, 9 Ariz.App. 29, 449 P.2d 46 (1969).

■ Whatever may be the ultimate solution of the question how far coercion by non-governmental sources can ever demand exclusion as distinguished from consideration by the fact-finder, in the instant case, on this issue of involuntariness in fact we find the distinction of *Garrity* noted in section I of this opinion to be important. There the penalty for a claim of a right to remain silent was mandatory dismissal from office, loss of accrued pension benefits and permanent disability from state or municipal employment. Here there was no certainty what penalty NYSE would prescribe if Solomon refused to speak. It seems plain to us that Solomon, who had conferred with counsel and had his lawyer present during the off-the-record and the later on-the-record interrogation, decided it would be to his advantage to make a clean breast of falsifications that were bound to be discovered, or, indeed, very likely had been, rather than add another item to the case against him. To be sure, Solomon's position was not a particularly pleasant one. But the rule excluding involuntary confessions does not protect against hard choices when a person's serious misconduct has placed him in a position where these are inevitable. Of course, if there were any question whether Solomon was responsible for the false entries in Weis' books, he would have been entitled to have a trier of the facts consider whether the circumstances under which he admitted having conceived the plan affected the reliability of his statement. But there was none. It would be a wholly unwarranted extension of the principle with respect to involuntary confessions to include Solomon's statement to the Exchange.

Affirmed.