MEMORANDUM AND ORDER
 

 GLASSER, District Judge.
 

 The defendants have moved the Court for an order that would (1) suppress all evidence obtained through an investigation conducted by the National Association of Securities Dealers (“NASD”) alleging that such evidence was obtained in violation of their Fourth Amendment rights; (2) dismiss Count Five for the reason that is exceeds the intended reach of the money laundering statute; (3) require the government to elect between money laundering objects; (4) require the government to proffer the propriety of venue for Count Five; (5) compel the government to comply with the mandates of
 
 Brady
 
 and
 
 Gig-lio;
 
 and (6) require the government to provide particulars with respect to Count Five.
 

 The defendants are named in a five count indictment which, summarized as succinctly as an understanding of it would require, charges as follows:-
 

 The first count charges them with conspiracy to commit securities, mail and wire fraud based upon the following abbreviated allegations. In July, 1996, Cluckcorp, a publicly held company participated in an initial public offering (“IPO”) of 1,000,000 shares of its common stock and 2,000,000 of its warrants. In this first of its IPOs, its stock was to be publicly offered at $5.50 per share and its warrants at 12.5 cents per warrant. Each warrant entitled its holder to purchase one share of common stock at $4.00 per share exercisable after one year from the date of the IPO and for four years thereafter.
 

 In June, 1997, Cluckcorp participated in a second IPO of 500,000 shares of its preferred stock and 1,500,000 of its preferred warrants. The preferred stock was publicly offered at $10.00 per share and the preferred warrants at 10 cents per warrant. Each warrant entitled its holder to purchase one share of preferred stock at $10.50 per share exercisable after six months from the date of this IPO and for four and a half years thereafter.
 

 Cluckcorp stock and warrants were traded on the National Association of Securities Dealers Automated Quotation System (“NASDAQ”) Small Cap stock market.
 

 
 *221
 
 The defendants operated Global Equities Group, Inc. (“Global”), a licensed brokerage firm for the primary purpose, it is alleged, of earning money through the fraudulent manipulation of the price of Cluckcorp securities, among other things.
 

 The securities activities of the defendants, Global and Cluckcorp, were subject to the rules and regulations of the Securities and Exchange Commission (“SEC”) and NASD.
 

 The indictment alleges that the defendants opened nominee accounts at Global over which they exercised control and through which they purchased large blocks of warrants and preferred warrants at the IPO prices. These purchases were not publicly disclosed. It is further alleged that the defendants then caused the artificial rise in the after market prices of Cluckcorp Securities by giving Global brokers large financial incentives to sell those securities to its customers. Those financial incentives included giving the brokers the warrants to put in their own nominee accounts without disclosure to the brokers’ customers. Warrants were thus aggressively sold to those customers by misrepresentations of fact pertaining to Cluckcorp and its prospects and by crossing the sell orders with matching buy orders creating an illusion of demand and thus artificially inflating the prices of the securities. When the prices were thus artificially inflated, the defendants then sold their warrants for between $2.00 - $4.00 per warrant and $3.00 - $5.00 per preferred warrant. The profits thus realized, it is alleged, were dispersed by the defendants through various foreign and domestic accounts in the same names as their nominee accounts at Global.
 

 The allegations of Count One spawn the charge of securities fraud in Count Two, mail fraud in Counts Three and Four, and a money laundering conspiracy in Count Five.
 

 The defendants’ motion to suppress is predicated upon their assertion of ample cause to believe that the NASD acted pre-textually in conducting its investigation of Global in 1996, 1997, and 1998, and in requiring the defendants to produce documents and submit to depositions under the guise of an inquiry to determine whether its rules were violated. They also point to the arrest of the defendant Paul in July, 1998, on a complaint filed in the Southern District of New York, charging him with violating currency reporting requirements and thus bolstering their claim for suppression.
 

 In its response, the government reveals that the aforementioned complaint was not aimed at the defendants Shvarts, Kuvykin or Global, but was aimed at the defendant Paul and his involvement with two different brokerage firms, namely, White Rock Partners and First Metropolitan Securities.
 

 Shvarts and Kuvykin were indicted here in April, 1999, and in a superseding indictment, Paul was added in June, 1999.
 

 In its opposition to this prong of the motion, the government urges the defendants’ failure to provide any factual basis beyond speculation that the NASD investigations were either directed by the government or used in any way to advance its criminal prosecution. In addition, the government emphasizes the defendants’ failure to make any connection, beyond simple conjecture, between the NASD investigation of Shvarts, Kuvykin and Global and Paul’s arrest in the Southern District, notwithstanding it is that arrest on which they stake their claim that the NASD was operating at the request of the government. The government also affirmatively represents that it played no role in the investigation of Shvarts, Kuvykin or Global by the NASD, an investigation that was initiated by the NASD years before the government’s investigation. Government’s Memorandum of Law in Opposition to the Defendants’ Motions at p. 5.
 

 Discussion
 

 The case most frequently cited in support of a motion to suppress in this pos
 
 *222
 
 ture is
 
 United States v. LaSalle National Bank,
 
 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) which addressed the issue of whether the District Court correctly refused to enforce an Internal Revenue Service summons when it specifically found that the special agent who issued it “was conducting his investigation solely for the purpose of unearthing evidence of criminal conduct.”
 
 Id.
 
 at 299, 98 S.Ct. 2357.
 

 At the outset it is important to bear in mind that the summons there was issued by a governmental agency, the Internal Revenue Service, pursuant to a statutory scheme not intended by Congress to categorize “tax fraud investigations into civil and criminal components.”
 
 Id.
 
 at 311, 98 S.Ct. 2357. That scheme notwithstanding, the Court observed that “the primary limitation on the use of a summons occurs upon the recommendation of a criminal prosecution to the Department of Justice.”
 
 Id.
 
 The policy interest served by such a limitation is the importance of not infringing on the role of the grand jury as the principal tool of criminal accusation. The likelihood of such infringement is substantial if use of the summons were permitted after a referral to the Justice Department for criminal prosecution.
 

 Another limitation imposed by the Court upon the use of the summons before a referral to the Department of Justice is that it be used in good faith, in furtherance of a legitimate purpose, and not to harass the taxpayer by pressuring him to settle a collateral dispute.
 
 Id.
 
 at 314, 98 S.Ct. 2357.
 

 Those opposing the enforcement of such a summons have the burden of disproving that it was issued in good faith, in an honest pursuit of the agency’s goals.
 
 Id.
 
 at 316. As will be discussed hereafter, the information sought from the defendants was by a private and not a governmental agency and sought not by a summons or subpoena, but by a letter request to respond to its inquiries. Assuming without deciding, however, that the limitations imposed by
 
 LaSalle
 
 on the Internal Revenue Service summons are applicable here, the defendants have offered nothing more than a theory that is “as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death.”
 
 Grosswald v. Schweiker,
 
 653 F.2d 58, 61 (2d Cir.1981).
 

 It is beyond cavil that the NASD is not a government agency; it is a private, not-for-profit corporation. It was not created by statute. None of its directors or executives are government officials or appointees. It receives no government funding, and not being a part of the government or owing its existence to the government, its actions cannot be imputed to the government nor can its agents bind the government.
 
 See Graham v. NASD,
 
 1998 WL 294022 (D.D.C.1998);
 
 United States v. Bloom,
 
 450 F.Supp. 323 (E.D.Pa. 1978).
 
 See also United States v. Handler,
 
 1978 WL 5690 (C.D.Cal.1978). It is also beyond cavil that questions, put to the defendants by the NASD in carrying out its own legitimate investigative purposes do not activate the privilege against self-incrimination nor would the Fourth Amendment place any limitation upon the NASD in pursuing its regulatory functions. Nor would a violation of a rule of the NASD which would subject the defendants to sanctions by that Association, and even to civil and criminal enforcement proceedings by the government, suffice to create an agency relationship between the NASD and the government.
 
 See United States v. Solomon,
 
 509 F.2d 863 (2d Cir.1975) (Friendly, J.)
 

 In that case, Alan Solomon was an officer of a brokerage firm which was a member of the New York Stock Exchange (N.Y.S.E.). In the course of an investigation into the affairs of the firm, Solomon was deposed by special counsel to the NYSE. His deposition was subsequently given- to the Securities and Exchange Commission (SEC) which placed the firm in receivership. An indictment followed in
 
 *223
 
 which Solomon, among others, was named. His deposition was presented to the grand jury and was an important basis for the indictment. Solomon moved to dismiss the indictment and to suppress the use of his testimony and any of its fruits at trial. His motion was denied by the district court and that denial was affirmed on appeal. In addition to holding that the questioning by the NYSE was not the equivalent of interrogation by the United States, the Court held that acceptance of Solomon’s contention would, in effect, mean that private bodies would be “unwittingly endowed with a power to grant” use immunity “where refusal entailed” potential economic harm. Such a result would be intolerable.
 
 Solomon,
 
 509 F.2d at 870.
 

 The teaching of
 
 Solomon
 
 is faithfully obeyed in
 
 United States v. Szur,
 
 1998 WL 132942 (S.D.N.Y.1998). There, examinations by the NASD were alleged to have been pretexts for assisting an ongoing federal criminal investigation and evidence thus obtained was sought to be seized. The Court dismissed the suppression motions as meritless without an evidentiary hearing, which it held was not required absent a meaningful and factual showing of an improper purpose by the agency.
 
 United States v. Gel Spice Co., Inc.,
 
 601 F.Supp. 1214, 1218 (E.D.N.Y.1985). As has already been determined, the defendants have made neither a meaningful nor a factual showing of an improper purpose by the NASD and their motion is denied.
 
 See also United States v. Lewis,
 
 40 F.3d 1325, 1332 (1st Cir.1994) (A defendant has neither an absolute nor a presumptive right to insist that a court take testimony on every motion without alleging “facts sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that a substantial claim is presented.”)
 

 The defendants have moved to dismiss Count Five contending that the conduct charged exceeds the intended reach of the money laundering statute, 18 U.S.C. § 1956(h). More specifically, they contend that the statute has been stretched “beyond permissible bounds, overcharging the same criminal activity as both fraud and money laundering.” Memorandum of Law in Support of Defendants’ Pretrial Motions at p. 7. They base their contention upon their reading of the statute’s legislative history as being designed to combat serious drug trafficking and organized crime, and as being intended to be a separate crime distinct from the underlying offense. Insofar as they suggest that the statute should not be applicable to activity that is neither drug nor organized crime related, their view of the statute is belied by its explicit terms. For example, the statute begins with these words: “(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of
 
 some form of unlawful activity,
 
 conducts or attempts to conduct such a financial transaction which in fact involves the proceeds
 
 of specified unlawful activity....
 
 ” (emphasis added). And in § 1956(c)(7) “specified unlawful activity” is defined to mean “any act or activity constituting an offense listed in section 1961(1)” which includes “fraud in the sale of securities.”
 
 See also United States v. Stavrou-lakis,
 
 952 F.2d 686, 691 (2d Cir.1992) (“Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money.”) In that case, it was money dirtied by bank fraud and the uttering of forged securities.
 

 Insofar as the defendants contend that the statute was designed to be separate and distinct from the underlying offense which must be completed before the proceeds from it are “laundered” in violation of § 1956, they are correct. Insofar as they claim that the indictment is deficient in that it does not reflect that the money alleged to be laundered was proceeds derived from a completed underlying offense, they are wrong.
 

 As has been indicated in the summary of the indictment, the underlying offense is securities fraud and the financial transactions alleged to violate § 1956 involve the
 
 *224
 
 proceeds derived from that unlawful activity. That the indictment charging money laundering, Count V, makes plain that it occurred after the completion of the underlying offense is apparent from a careful reading of that count which begins by incorporating the allegations of the preceding paragraphs numbered 1 - 21. Two of those paragraphs allege as follows:
 

 20. As a further part of the schemes, once the prices of the Cluckcorp securities rose artificially in the aftermarket, the defendants ALEKSANDR SHVARTS, IGOR ERIK KUVYKIN and ALEKS PAUL, together with others, sold their Cluckcorp warrants and preferred warrants from the nominee accounts at prices that typically ranged between $2.00 and $4.00 per warrant and $3.00 and $5.00 per preferred warrant.
 

 21. The defendants ALEKSANDR SHVARTS, IGOR ERIK KUVYKIN, ALEKS PAUL and others
 
 dispersed the profits generated from, these sales
 
 through various foreign and domestic accounts in the same names as the • defendants’ nominee accounts at Global, (emphasis added)
 

 The paragraphs faithfully reflect the observation of the Court of Appeals for the Fifth Circuit in this regard that “[a] fraudulent scheme produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators.”
 
 United States v. Allen,
 
 76 F.3d 1348, 1361 (5th Cir.) cert. denied, 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 71 (1996).
 
 Allen
 
 was relied upon and regarded as dispositive in a case which in all significant respects, as has already been noted, is virtually identical to this one.
 
 United States v. Szur,
 
 1998 WL 132942 (S.D.N.Y. 1998)
 

 The defendants’ motion also seeks an order that would require the government to elect the prong of the money laundering statute that it intends to pursue. More specifically, Count Five charges a conspiracy to violate § 1956(a)(1)(A) money laundering “with the intent to promote the carrying on of unlawful activity” and § 1956(a)(1)(B)© knowing that the money laundering transaction “is designed in whole or in part to conceal the nature, location, source, ownership and control of the proceeds of the specified unlawful activity.”
 

 The government’s response is that they intend to pursue both prongs of that statute. There is no authority which prevents it from doing so. The government has noted its awareness of
 
 United States v. Jackson,
 
 935 F.2d 832, 842 (7th Cir.1991) in which that Court suggested “that the government should advise the district court and defense counsel whether it is proceeding under” one or the other or both “and that the jury be charged accordingly.” The government has done so and this strand of the defendants’ motion is denied.
 

 The defendants’ motion seeking an order requiring the government to proffer the propriety of venue for Count Five is denied. It would be an effectuation of research to cite the many cases which hold that venue is a fact to be proven by the government at trial by a preponderance of the evidence and that allegations of venue in the indictment must be taken as true. Count Five alleges that the defendants conspired to launder money between March, 1995 and December, 1997 “within the Eastern District of New York and elsewhere.” That would suffice to warrant the denial of the motion. In its Memorandum of Law, however, the government advises the defendants that it intends to prove the use of a Brooklyn address for a nominee account; the sending of a check to that Brooklyn address by a co-conspirator in furtherance of the conspiracy; and that the defendant Paul met at his home in the Eastern District with a co-conspirator to discuss the conspiracy.
 

 The defendants also move this Court for an order that would direct the government to disclose all information “which is argu
 
 *225
 
 ably within the scope of
 
 Brady.”
 
 The government’s response is predictably familiar: that it is aware of its obligations under
 
 Brady v. Maryland,
 
 873 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny and will comply with them.
 
 United States v. Deutsck,
 
 373 F.Supp. 289, 290 (S.D.N.Y.1974). The government has represented that is has complied with those constitutional obligations and has already disclosed to the defendants all exculpatory information encompassed by
 
 Brady
 
 and will promptly disclose any such additional information which may become known to it. Government’s Memorandum of Law at 20. There is no reason to believe that having discharged its obligations thus far, the government will not continue to do so and therefore an order to that effect is not warranted.
 

 The parties disagree as to the reach of
 
 Brady.
 
 The defendants request the government to provide information it possesses or is aware of, which they may use to impeach government witnesses, asserting that such information is embraced by
 
 Brady.
 
 The government resists that request as being premature, asserting that it will give “material” impeachment evidence sufficiently in advance of a witness’ testimony so as to be of use to the defendant. The government also asserts that the defendants mistakenly believe that “all
 
 Brady
 
 material, including impeachment information, must be disclosed before trial.” Government Memorandum of Law at 20-21. The Court’s reading of the relevant authorities leads it to conclude that it is the government and not the defendants that is mistaken.
 

 In
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) the government failed to disclose an alleged promise to a witness that if he testified for the government he would not be prosecuted. That witness was Giglio’s alleged co-conspirator. In holding that Giglio was entitled to a new trial the Court wrote at p. 154:
 

 When the reliability of a given witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility falls within [the Brady rule] ...
 

 The holding in
 
 Brady,
 
 based as it was
 
 on
 
 the demands of due process, was aimed at ensuring that the trial of a defendant will be a fair one and, in pursuit of that end the Court in
 
 United Slates v. Bagley,
 
 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), held unequivocally, at p. 676, that:
 

 Impeachment evidence, ... as well as exculpatory evidence falls within the
 
 Brady
 
 rule, “fas being] ‘evidence favorable to an accused’ ... so that if disclosed and used effectively, it may make the difference between conviction and acquittal.”
 

 More recently, in
 
 Kyles v. Whitley,
 
 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) the Court observed that “In ...
 
 United States v. Bagley,
 
 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) the Court disavowed any difference between exculpatory and impeachment evidence for
 
 Brady
 
 purposes.... ” kSee also
 
 United States v. Wong,
 
 78 F.3d 73, 79 (2d Cir.1996) (“evidence whose disclosure is required under
 
 Brady
 
 may consist not only of exculpatory evidence but also of impeachment evidence.”)
 
 United States v. Leung,
 
 40 F.3d 577, 582 (2d Cir.1994) (“It is well established that upon a request by a defendant, the Government has a duty to turn over all mateiial exculpatory evidence in its possession .... including material impeachment evidence relating to Government witnesses....”)
 

 Given those unambiguous pronouncements, the government’s resistance to granting a request for impeachment evidence can only be explained, perhaps, by the ambiguous pronouncements in that regard in many cases, some of which were relied upon by the government. A few examples may suffice.
 

 In
 
 Untied States v. McGuinness,
 
 764 F.Supp. 888, 896 (S.D.N.Y.1991), the
 
 *226
 
 Court, addressing, the defendant’s discovery requests, wrote: “Requests 1 - 4 are obviously not
 
 Brady
 
 material in the sense of evidence that tends directly to exculpate the defendant,
 
 but are useful to the defense for impeachment purposes
 
 only. But see
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 ... (1985)
 
 (government must disclose impeachment
 
 material).” (emphasis mine)
 

 Contributing to that confidently asserted resistance as well is the seeming justifica-tion for it believed to follow from two frequently stated propositions. They are: (1) There “is no general constitutional right to discovery in a criminal case and
 
 Brady
 
 did not create one”
 
 Weatherford v. Bursey,
 
 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); and (2) as a general matter, a defendant has no constitutional right to receive either
 
 Brady
 
 or
 
 Giglio
 
 material prior to trial.
 
 United States ex rel. Lucas v. Regan,
 
 503 F.2d 1, 3 n. 1 (2d Cir.1974).
 

 As concerns the first, no citation of authority should be necessary for the proposition that obligations and rights are correlative. That is to say, the imposition of an obligation upon one creates a corresponding right in another. That the obligation of the government to disclose impeachment as well as exculpatory evidence favorable to an accused is an obligation of constitutional dimension is beyond cavil.
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (the suppression by the prosecution of evidence favorable to the defendant violates due process where the evidence is material to guilt or punishment);
 
 United States v. Agurs,
 
 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (a prosecutor violates his constitutional duty if his failure to disclose results in a denial of defendant’s right to a fair trial);
 
 United States v. Bagley,
 
 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (The failure to provide the defendant with impeachment evidence would be constitutional error if it deprived him of a fair trial). It is. sufficient to acknowledge, for this purpose, the constitutional obligation, without the necessity to discuss the requirement of “materiality” as a precondition to its violation, as to which,
 
 see e.g., Kyles v. Whitley,
 
 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). That constitutional obligation of the government to disclose creates a corresponding right in the accused to receive. Thus, although it is correct to declare that there is no
 
 general
 
 constitutional right to discovery in a criminal case, it must also surely be correct to declare that there is a
 
 specific
 
 constitutional right in the defendant to requested discovery of impeachment and exculpatory evidence favorable to him.
 

 As to the second, namely that the defendant has no constitutional right to receive either
 
 Brady
 
 or
 
 Giglio
 
 material prior to trial, the derivation of that generally accepted principle, is curious given the explicit declaration in
 
 Brady
 
 that “A prosecution that withholds evidence
 
 on demand of an accused
 
 which, if made available, would tend to exculpate him or reduce the penalty, helps shape a trial that bears heavily on the defendant.” 373 U.S. at 87-88, 83 S.Ct. 1194. (emphasis mine). In
 
 Weatherford v. Bursey,
 
 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) frequently cited for the principle that “there is no general constitutional right to discovery in a criminal case,” the Court understood
 
 Brady
 
 to hold that:
 

 [t]he prosecution has the “duty under the due process clause to ensure that ‘criminal trials are fair’ by disclosing evidence favorable to the defendant
 
 upon request.”
 

 429 U.S. at 559, 97 S.Ct. 837.
 
 Cf. United States v. Nixon,
 
 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (“Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.”)
 
 [1]
 

 
 *227
 
 A consequence of the declaration in
 
 United States ex rel. Lucas v. Regan, supra,
 
 is the conflation of
 
 Brady
 
 and the Jencks Act, 18 U.S.C. § 3500 which provides in substance that no statement in government possession which was made by a government witness or prospective government witness shall be the subject of discovery until the witness has testified on direct examination.
 
 See also
 
 Fed.R.Cr.Pr. 26.2;
 
 United States v. Tucker,
 
 495 F.Supp. 607, 610 (E.D.N.Y.1980) (“The Government has indicated that it has only impeachment, not exculpatory material with respect to Verner and that it will be turned over to the defendant at the commencement of his trial. Neither the case law nor § 3500 require the Government to turn over such material at the time of pretrial motions.”);
 
 United States v. Strawberry,
 
 892 F.Supp. 519, 527 (S.D.N.Y.1995) (“Goldschmidt also requests disclosure of § 3500 material and impeachment material two weeks prior to trial. It is well-settled, however, that the Government need not disclose § 3500 material and impeachment material until the witness has testified.”);
 
 United States v. Victor Teicher & Co.,
 
 726 F.Supp. 1424, 1442 (S.D.N.Y.1989) (“The Government proposes to make the impeachment material available to the defendants on the same basis as it will make § 3500 material.”);
 
 United States v. McGuinness,
 
 764 F.Supp. 888, 896 (S.D.N.Y.1991) (“Requests 1 - 4 are obviously not
 
 Brady
 
 material in the sense of evidence that tends directly to exculpate the defendant, but are useful to the defense for impeachment purposes only.
 
 But see United States v. Bagley
 
 (citation omitted) (government must disclose impeachment material) .... It is well settled that the government is not required to disclose impeachment material before the relevant witness has testified”);
 
 United States v. Feldman,
 
 731 F.Supp. 1189, 1200 (S.D.N.Y.1990) (“As to
 
 Brady
 
 impeachment material which defendants seek, the government recognizes its well-established obligation to produce that material and states its intent to make such production along with the 3500 material for each government witness.”)
 

 In
 
 Jencks v. United States,
 
 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) the Court held “that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused’s inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial.”
 
 Id.
 
 at 672, 77 S.Ct. 1007. In reaching its decision, the Court placed considerable reliance upon
 
 United States v. Reynolds,
 
 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) which noticed the holdings of two Second Circuit cases,
 
 United States v. Beekman,
 
 155 F.2d 580 (2d Cir.1946) (Frank, J.) and
 
 United States v. Andolschek,
 
 142 F.2d 503 (2d Cir.1944) (L.Hand, J.), summarizing the essence of those cases as follows: “The rationale of [those] cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privilege to deprive the accused of anything which might be material to his defense.”
 
 Reynolds,
 
 345 U.S. at 12, 73 S.Ct. 528.
 

 Jencks
 
 met with considerable criticism.
 
 See
 
 Podgor, Criminal Discovery of Jencks Witness Statements: Timing Makes a Difference, 15 Ga.St.U.L.Rev. 651 (1999) (referring in f.n. 50 to Edward Bennett Williams, One Man’s Freedom 175 (1962), who wrote that “The Jencks decision raised a storm of conflict. It was widely predicted that every file would be opened to the forces of subversion and that law enforcement would become impossible.”).
 

 Congress responded to the
 
 Jencks
 
 decision by enacting what is now commonly referred to as the Jencks Act which, in its final enactment, limited the release of the statements of government witnesses after they testified at trial to protect the security of witnesses, safeguard confidential in
 
 *228
 
 formation in government files -from defendants, and avoid injury to the reputations of innocent persons and at the same time serving to protect the rights of the defendant. H.R.Rep. No. 700, 85th Cong., 1st Sess. 3 (1957) at 3; S.Rep. No. 981, 85th Cong., 1st Sess. 3 (1957) at 3 - 4.
 

 The decision in
 
 Brady
 
 some six years after the enactment of the Jencks Act inevitably gave rise to the issue of whether the timing of
 
 Brady
 
 or the Jencks Act was controlling. An insightful and persuasive discussion of that issue is to be found in
 
 United States v. Snell,
 
 899 F.Supp. 17 (D.C.Mass.1995) (Gertner, J.) from which I quote at some length. That Court wrote, at page 21:
 

 To be sure, when exculpatory evidence is in the form of witness statements, the Brady obligation of pre-trial disclosure appears to be inconsistent with the Jencks Act obligation of disclosure after a witness has testified, hence, the question of which law trumps which. It is inconceivable that a statutory obligation should supersede a constitutional one, especially where even the statutory obligation has a constitutional Due Process basis. The case on which the Jencks Act was based,
 
 Jencks v. United States,
 
 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), held that criminal defendants were entitled to access to prior statements of government witnesses testifying against them. Using language similar to that used in
 
 Brady,
 
 the Court held that to deny disclosure was to “deny the accused of evidence relevant and material to his defense” and to undermine the prosecutor’s public role to achieve justice (footnotes omitted).
 

 ^ ^
 

 Under the circumstances, I agree with the Court in
 
 United States v. Narciso,
 
 446 F.Supp. 252, 270 (E.D.Mich.1977): “[W]hen two principles of law conflict with one another the criminal justice system demands that the principle favoring greater discovery in favor the accused must prevail, particularly where, as here, the principle favoring disclosure is of constitutional origin.” Put otherwise, in seeking to harmonize the Jencks Act and Brady, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like
 
 Brady,
 
 and an expansive interpretation of a statutory one like Jencks. See also
 
 United States v. Poindexter,
 
 727 F.Supp. 1470 (D.D.C.1989).
 

 The Court then quotes from
 
 Poindexter
 
 at 1485 in a footnote, as follows:
 

 The
 
 Brady
 
 obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has the obligation to produce to defendant immediately any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material....
 

 To be sure, the Courts are not unanimous on this issue. See e.g.
 
 United States v. Presser,
 
 844 F.2d 1275, 1283 (6th Cir.1988) (If impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence.);
 
 United States v. Higgs,
 
 713 F.2d 39, 44 (3rd Cir.1983), cert. denied, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984);
 
 United States v. Starusko,
 
 729 F.2d 256, 262 (3rd Cir.1984) (“there is no unconstitutional denial of due process if
 
 Brady
 
 material is disclosed in time for its effective use at trial.”)
 

 Research has uncovered no case in which the issue was squarely addressed by the Court of Appeals for this Circuit, although its observation in
 
 United States v. Leung,
 
 40 F.3d 577, 582 (2d Cir.1994) may be regarded as reflecting its view: “It is well established that
 
 upon a request by a defendant,
 
 the Government has a duty to turn over all material exculpatory evidence in its. possession, ... including material impeachment evidence relating to government witnesses.... ” (emphasis added)
 

 Mindful of the limitation imposed upon the power of the court by the Jencks Act as to non-exculpatory or non-impeachment
 
 *229
 
 evidence, the Court does not direct the government to turn over such statements prior to the testimony of the witness at trial. It does not follow, however, that the government may not voluntarily disclose such statements prior to trial and, in this district, the United States Attorney routinely does.
 

 As to exculpatory or impeachment evidence, it being the view of the court that the constitutional obligations imposed upon the prosecutor by
 
 Brady, Giglio, Agwrs
 
 and
 
 Bagley
 
 must prevail over the Jencks Act where the two collide, the government is hereby directed to make such evidence known to the defendants. Should it be the government’s view that immediate disclosure of impeachment evidence would pose a serious threat to the life or safety of a prospective witness, an
 
 ex parte
 
 application may be made for an appropriate modification of this order setting forth the facts in support of that belief. I would add that “the prudent prosecutor will resolve doubtful questions in favor of disclosure.”
 
 United States v. Agurs,
 
 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
 

 Finally, the defendants’ motion for a bill of particulars was resolved at the hearing by the government’s agreement to furnish the particulars desired.
 

 SO ORDERED.
 

 [1]
 

 . It should be noted that
 
 Nixon
 
 was decided 11 years before Bagley's holding that impeachment evidence was encompassed by
 
 Brady.