UNEMPLOYMENT INSURANCE AP-PEAL BOARD and Globe Union, Inc., Defendants Below, Appellants,

v.

John H. MARTIN and Trudy L. Martin, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted May 12, 1981.

Decided June 16, 1981.

James R. Leonard (Argued), of Potter & Carmine, P. A., Wilmington, for defendants below, appellants.

Harvey B. Rubenstein (Argued), of Wilmington, for plaintiffs below, appellees.

Before DUFFY, McNEILLY and QUILLEN, JJ.

McNEILLY, Justice:

John and Trudy Martin (hereinafter "claimants") applied for unemployment compensation benefits following termination of their employment with Globe Union,

Inc. (hereinafter "employer"). These applications were denied at all administrative levels on the grounds that claimants had been discharged from their employment for just cause in connection therewith pursuant to 19 *Del.C.* § 3315(2).[1] Following the adverse decision by the Unemployment Insurance Appeal Board (hereinafter "Board"), claimants appealed to the Superior Court which reversed the Board's denial of benefits. From this decision the employer appeals. We reverse.

. ██ As we read the decision below, the Superior Court accepted the Board's findings of fact as based on substantial evidence in the record, but reversed the Board's decision by holding as a matter of law that the facts did not warrant the conclusion that claimants were disqualified from benefits under § 3315(2). We agree that the administrative fact findings are supported by the record; therefore, we are bound by those findings on this appeal. Thus, the primary issue before this Court is whether the Superior Court erred in its application of § 3315(2) to the facts as found by the Board. Claimants also raise certain constitutional and evidentiary arguments relating to the administrative proceedings as alternative grounds on which the Superior Court's decision reversing the Board should be affirmed.

The facts found by the referee and adopted by the Board are as follows. Claimants, husband and wife, were employed as operators by Globe Union, Inc. At the time of the incident in question, John Martin had been thus employed for seventeen years, Trudy Martin for seven years. On July 17, 1979, claimants were scheduled to work from 7:00 A.M. to 3:30 P.M. Upon arriving for work, claimants informed their supervisor they had to leave at noon to attend to some personal business. The supervisor felt obligated to inquire further as to claimants' reasons for wanting to leave work early, as the employer's plant had recently been closed down by a strike and every effort

was needed to get the plant back to full production. When the supervisor asked for a more specific reason, Mr. Martin replied that he did not have to be more specific than to say that he and his wife had personal business to transact. At this point the supervisor denied claimants' request for permission to leave early.

In spite of this initial denial, several more discussions concerning the Martins' request were held during the morning. These culminated in a meeting between claimants, a union representative who had interceded on their behalf, the supervisor and other higher officials at the plant. At this meeting claimants for the first time sought to clarify the reason for their request. However, their only explanation was that they had to go to the bank. Claimants did not attempt to explain why they had to go to the bank on that particular day during their scheduled working hours. Rather, claimants contended that they had a right to leave under the employer's liberal time off policy. Again permission to leave early was denied, and claimants were explicitly warned that their failure to remain at work through their scheduled shift would result in termination of their employment. Claimants left work at noon and failed to return to their jobs that day. Because claimants had been represented by the union during the morning's discussions and were explicitly warned of the consequences that would result from disobedience to the employer's order, management felt it had no alternative but to discharge claimants from their jobs.

Claimants were employed subject to the terms of a union negotiated collective bargaining agreement which contained no provision for personal time off during regular scheduled working hours. Also, a union sanctioned grievance procedure was available to employees who felt aggrieved by management decisions. Claimants did not submit their complaint regarding the refusal of permission to leave early to this procedure, choosing instead to ignore the employ-

---

1. Section 3315(2) provides in pertinent part that a claimant is disqualified from benefits "[f]or the period of unemployment next ensu-

ing after an individual has been discharged from his work for just cause in connection with his work."

er's direct order and explicit warning. It does appear that, as a general policy, the employer tried to accommodate employee requests for personal time off for any number of reasons, including time off to go to the bank. Ultimately, however, decisions on such requests were always based on the employer's evaluation of its production needs as compared with the employees' stated reasons for requesting time off from scheduled working hours. The employer was not obligated to grant such requests and could deny them without any detailed explanation to the requesting employees. As for the specific incident here in issue, it appears that production at the employer's plant was suffering because some machines were not functioning properly, and the supervisor believed that claimants, with their significant experience, would be helpful in resolving the problems. These considerations, coupled with claimants' failure to substantiate an urgent or immediate need for time off to go to the bank, led to the decision to deny claimants' request. The Board specifically found that the employer's denial of claimants' request was not unreasonable.

Findings of fact were also made regarding the purpose underlying claimants' request. Claimants wanted to go to their bank in Sudlersville, Maryland, located a substantial distance from the employer's plant, to arrange for a loan. Apparently, the bank would have been closed on the day in question (a Tuesday) by the time claimants' scheduled shift had ended at 3:30 P.M. However, it would have been possible for claimants to go to the bank after their scheduled shift on the following Friday, as banks in the area remain open on Friday evenings. Claimants intended to use the loan proceeds to repay money previously borrowed from a personal friend. The friend had asked to be repaid as soon as possible, without specifying a particular date, since his mother had recently gone into a hospital for cancer treatment and he (the friend) had assumed financial responsibility for the medical expenses. Claimants believed this to be an urgent request and felt obligated to repay the friend as soon as

possible, *i. e.*, immediately. However, claimants never explained these background details to the employer in requesting time off. The referee and Board found that, while claimants may have subjectively believed this was an emergency situation requiring immediate action on their part, there was no real emergency necessitating that claimants leave work early on the specific day in question. On the basis of these findings, the Board concluded that claimants had been discharged for just cause in connection with their work and were, therefore, disqualified from benefits under § 3315(2).

In reversing the Board's decision, the Superior Court ultimately concluded that the administrative findings did not establish that claimants were discharged for "just cause" as defined in *Abex Corporation v. Todd*, Del.Super., 235 A.2d 271 (1967). While we agree that *Abex Corporation* does correctly delineate the scope of the term "just cause" as used in § 3315(2), we disagree with the Superior Court that the facts as found at the administrative level do not satisfy the *Abex Corporation* test.

The controlling test as stated in *Abex Corporation* is as follows:

> "Generally, the term 'just cause' refers to a wilful or wanton act in violation of either the employer's interest, or of the employee's duties, or of the employee's expected standard of conduct." 235 A.2d at 272.

Certainly claimants' actions in leaving work early without permission was wilful in that they did so voluntarily, intentionally and deliberately. We believe it is equally clear that these actions were also in violation of the employer's interest, the claimants' duties *and* the claimants' expected standard of conduct. The employer's interest at the time in question included bringing its plant back to full production, and, as found by the Board, it was not unreasonable for the employer to conclude that claimants, with their long experience at the plant, could have helped achieve this goal by remaining on the job for the duration of their scheduled shift. Also, as a general proposition, it

cannot be seriously argued that claimants' duties did not include remaining on the job during their regularly scheduled hours. Clearly, there may be exceptions to this general rule, as where an employee becomes too ill to work or where a true emergency, fully explained to the employer, requires the employee's presence elsewhere during normal working hours. However, the Board found no such exigencies under the circumstances of this case, and the record contains sufficient evidence to support that finding. Lastly, we believe that the claimants' expected standard of conduct required that they obey a direct, unequivocal, reasonable order of the employer to remain on the job throughout their scheduled shift. In this regard, we agree with the observation of the referee below that the employer's business would be in a chaotic state if each employee could decide for himself which of the employer's reasonable orders he might follow on any given occasion. We find nothing in the unemployment compensation laws requiring such an anomalous result.

██ The flaw in the Superior Court's analysis was its conclusion that this case is governed by the rule established in *Weaver v. Employment Security Commission*, Del. Super., 274 A.2d 446 (1971), and *Boughton v. Division of Unemployment Insurance*, Del.Super., 300 A.2d 25 (1972). These cases stand for the proposition that "[a] single instance of irresponsible failure to heed an employer's instructions does not rise to the level of a wilful or wanton act in violation of the employee's expected standard of conduct where it appears that the employer tolerated previous actions of similar severity without warning." *Boughton*, 300 A.2d at 27. While conceding that the facts found below establish that claimants were discharged for a single instance of misconduct, we cannot agree that the administratively found facts bring this case within the purview of *Weaver* and *Boughton*. Specifically, there were no fact findings from which one could reasonably conclude that the employer had tolerated previous employee conduct similar to that engaged in by these claimants. The findings estab-

lished that the employer had a liberal policy for granting employees time off from scheduled work, that this policy was exercised with regard for the employer's production needs as well as the employee's proffered reasons for desiring time off, and that the employees had to obtain permission from the employer in order to take such time off. The fact that the employer's time off policy was liberal, not absolute, obviously means that, although the employees' desires might usually prevail, there would be situations in which the employer's needs would take preference and the employee's request for time off would be denied. The Board found that this case involved one such situation where the employer reasonably concluded that its need for the claimants' presence during their scheduled shift outweighed the claimants' desire for time off to go to the bank. Also, the Board found that claimants had been given explicit warnings that if they chose to disobey the order to remain at work they would be fired. Lastly, the Board made no finding that the employer had previously tolerated insubordination by employees to direct orders to remain at work during scheduled hours accompanied by the explicit threat of termination for disobedience. All of these circumstances distinguish the instant case from *Weaver* and *Boughton* and render the rule enunciated therein inapplicable.

██ Having determined that the administratively found facts were legally sufficient to support the conclusion that claimants were discharged for just cause, we now consider claimants' alternative arguments for reversing the decision of the Board. First, claimants argue that they were denied due process of law during the administrative proceedings in that they were not given a full and fair hearing on their claims for benefits. The basis for this claim lies in rulings made during the hearing before the Board limiting the number of witnesses which claimants were allowed to call to testify on certain factual matters in issue. We have reviewed the entire transcript of that hearing, as well as all other proceedings in this case at the administrative level,

and are satisfied that claimants were given a full and fair hearing on their claims. As for the Board's precise ruling limiting the witnesses to be called by claimants, it appears that this was done to prevent the introduction of unnecessary cumulative evidence on the question of the employer's past practice in granting personal time off to employees. The record shows that in addition to claimants' testimony the Board heard two other witnesses called by claimants to testify regarding the employer's past practice. After introducing this testimony claimants sought to call at least two more witnesses whose anticipated testimony, as revealed by a proffer of evidence entered by claimants' counsel on the record, would have further corroborated the testimony already given on claimants' behalf. At this point the Board ruled that claimants would be permitted to call only one more witness to testify on this question. Under these circumstances, we find no error or abuse of discretion in the Board's ruling.

■ Claimants also argue that the administrative decision should be reversed because the referee admitted certain hearsay evidence relating to the discussions between claimants and management personnel on the day in question and relied on this evidence in rendering his decision. Although it appears that such evidence was admitted and relied upon by the referee in his first hearing and decision, it is clear that any error committed thereby was cured during the remand to the referee after the first hearing before the Board. Specifically, the Board remanded the case to the referee with instructions that the supervisor involved in the incident, whose version of the facts had originally been introduced through hearsay evidence, be produced in person to testify from his own memory as to the facts in dispute. The record shows that the supervisor did testify in person at the second hearing before the referee, and that the referee's and the Board's ultimate findings were based on this live testimony. Therefore, even though inadmissible hearsay was permitted and relied upon in the first referee hearing and decision, this error was adequately cured at the second referee hearing. Thus, we find no merit in this argument.

We conclude that the Board's findings of fact are supported by substantial evidence in the record and that such facts were legally sufficient to establish that claimants were discharged for just cause in connection with their work. Therefore, the decision of the Superior Court is hereby REVERSED and the case is REMANDED with instructions to affirm the decision of the Board.