Gerard MOELLER and Robert
Angiollilo, Claimants Below,
Appellants,

v.

WILMINGTON SAVINGS FUND
SOCIETY, Employer Below,
Appellee.

No. 172, 1998.

Supreme Court of Delaware.

Submitted: Nov. 17, 1998.
Decided: Feb. 16, 1999.

Joseph Grey, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware, for Appellants.

Thomas P. Preston, and Richard S. Cobb, of Duane, Morris & Heckscher, LLP, for Appellee.

Before VEASEY, Chief Justice, HOLLAND and BERGER, Justices.

BERGER, Justice:

In this appeal, we consider whether two claimants seeking unemployment insurance benefits were terminated for "just cause," within the meaning of the disqualifying statute. The Unemployment Insurance Appeal Board found that claimants exercised poor judgment, but that the employer did not have just cause to fire them, as they had not engaged in wilful or wanton misconduct. The Superior Court reversed the Board, finding that the claimants acted against the employer's interest and violated expected standards of conduct. We conclude that the Board's factual findings were supported by substantial evidence and that it correctly applied the law. Therefore, the Board's decision must be reinstated.

### I. Factual and Procedural Background

Gerard Moeller and Robert Angiollilo each had more than twenty years experience in the financial industry when they were hired by 838 Investment Group, Inc., a wholly-owned subsidiary of Wilmington Savings Fund Society. 838 was formed in 1994 to market various insurance products and mutual funds through WSFS's branch system. The company was in business for only two years and, at its peak, it had four employees. Dennis O'Malley, a Vice President of WSFS, was 838's President and Chief Executive Officer. Moeller, Angiollilo, and another former WSFS employee were 838 sales representatives, and reported directly to O'Malley. 838 marketed its financial products through a referral program designed and drafted by O'Malley. WSFS employees were asked to refer bank customers, who might be interested in purchasing one of 838's products, by providing relevant information on a referral slip and forwarding the slip to 838. The 838 sales representative was supposed to contact the prospect and try to arrange a meeting to discuss investments. If a face-to-face meeting actually occurred, then the employee at WSFS who made the referral would get a small bonus of about twenty dollars. To establish that the contact had been made, and the bonus earned, the sales representative simply signed the referral slip and turned it over to 838 for processing.

In the fall of 1996, a few WSFS employees complained to their superiors about the referral program. In response, WSFS contacted several people identified on the signed referral slips to see if they actually met with an 838 sales representative. WSFS learned that some prospects never met, or even spoke on the phone with, a sales representative.

WSFS representatives interviewed both claimants during the investigation into referral practices. Moeller initially stated that he contacted everyone on the slips he signed, either face-to-face or by telephone. In a subsequent interview, however, Moeller acknowledged that he may have signed some of the slips without ever making contact. Moeller defended his conduct by saying that O'Malley authorized exceptions to the referral policy and that, if he signed any slips for prospects that he did not contact, he did so inadvertently in the course of signing a pile of forms.

Angiollilo also claimed that O'Malley gave the sales representatives permission to sign referral slips occasionally without first making contact with a prospect. Angiollilo explained that the referral bonus boosted WSFS employee morale and helped the branch offices make their quotas. O'Malley confirmed both claimants' statements. He explained that the sales representatives were allowed to use their own judgment in signing the referral slips, since the signed slips were a motivational tool designed to increase referrals.

After concluding its investigation, WSFS fired everyone working at 838, including its chief executive, O'Malley, and shut down the subsidiary's operations. Moeller and Angiollilo applied for unemployment benefits, but WSFS opposed their claims on the ground

that the men were fired for just cause. The Board awarded unemployment benefits, finding that claimants' falsification of corporate documents did not constitute wilful or wanton misconduct since both individuals had received permission to endorse the referral slips without face-to-face contact. The Superior Court reversed, holding that claimants' dishonesty, even if allowed by their supervisor, was "contrary to WSFS' benefit, claimants' duties and their expected standard of conduct."

## II. Discussion

■ An employee who is discharged for "just cause" is disqualified from receiving unemployment insurance benefits.[1] "Just cause" generally exists if an employee commits a "wilful or wanton act ... in violation of the employer's interest, the employee's duties, or the employee's expected standard of conduct."[2] If an employer consistently tolerates wilful or wanton misconduct, however, the employer may not be justified in firing employees without first warning them that their conduct no longer is acceptable.[3]

■ Claimants argue that they received no warning and were not otherwise on notice that their conduct would result in termination. The Superior Court determined that the facts of this case did not raise a "failure to warn" issue, since the employee handbook expressly stated that falsification of corporate documents was prohibited and that such conduct would be grounds for termination. The question, as the Superior Court viewed it, was whether claimants' falsification of documents constituted wilful or wanton misconduct in light of the fact that they had their supervisor's permission to do so. Since there was no Delaware precedent on point, the Superior Court considered decisions in other jurisdictions and concluded, as a matter of

law, that a supervisor's authorization does not justify dishonest business practices.

In the cases relied on by the Superior Court, the employees had engaged in conduct that was unlawful—accepting overtime pay for hours that they had not worked,[4] and billing Medicaid for medical services that had not been provided.[5] The claimants in those cases could not have reasonably relied on their superior's authorization since the conduct being "authorized" was illegal, and possibly criminal. Claimants in this case, by contrast, were signing referral slips without first meeting the prospect. They were not breaking any laws or subjecting their employer to potential civil or criminal liability. At worst, they were violating an office policy—with the permission of the company's chief executive. At best, they were doing nothing wrong. As 838's President and Chief Executive Officer, O'Malley had at least apparent authority to modify the office policy he had written,[6] and the fact that the modification was oral, rather than written, did not make it any less effective.[7]

Under either interpretation of the record facts, claimants' conduct was not so clearly inconsistent with their duties, their employer's interest, or expected standards of business practice as to constitute wilful or wanton misconduct as a matter of law. Rather, it was up to the fact finder to decide whether, under all the circumstances, claimants' conduct was wilful or wanton for any of the three reasons stated above. The Board found that claimants: (i) were authorized to act as they did; (ii) received no personal benefit from the challenged behavior; and (iii) were not warned, prior to termination, that their practices were unacceptable. Those factual findings formed the basis for the Board's legal conclusion that claimants'

---

1. *19 Del.C.* § 3315(2).

2. *Avon Products, Inc. v. Wilson,* Del.Supr., 513 A.2d 1315, 1317 (1986).

3. *Ortiz v. Unemployment Insurance Appeal Board,* Del.Supr., 317 A.2d 100 (1974).

4. *Brode v. Unemployment Comp. Bd. of Rev.,* 79 Pa.Cmwlth. 630, 470 A.2d 200 (1984).

5. *Dempsey v. Unemployment Comp. Bd. of Rev.,* 92 Pa.Cmwlth. 524, 499 A.2d 740 (1985).

6. *Haveg v. Guyer,* Del.Supr., 226 A.2d 231 (1967).

7. *See: Pepsi–Cola Bottling Co. of Asbury Pk. v. Pepsico, Inc.,* Del.Supr. 297 A.2d 28, 32 (1972) (a course of conduct can amend a contract as effectively as a written modification).

behavior, although inappropriate, was not wilful or wanton.

### III.  Conclusion

The decision of the Unemployment Insurance Appeal Board is supported by substantial evidence and is free from legal error.[8] Accordingly, we REVERSE the Superior Court and REMAND for further proceedings consistent with this opinion.

---

8.  *Avon Products, Inc. v. Wilson,* 513 A.2d at      1315.