Gilman v. Marsh & McLennan Cos.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: January 13, 2016    Decided: June 16, 2016)

Docket No. 15-0603-cv(L)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

WILLIAM W. GILMAN, EDWARD J. McNENNEY, JR.,

<u>Plaintiffs-Appellants</u>,

- v.-

MARSH & McLENNAN COMPANIES, INC., MARSH INC., MARSH USA INC., MARSH GLOBAL BROKING INC., MICHAEL CHERKASKY,

<u>Defendants-Appellees</u>.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before: KEARSE, WINTER, and JACOBS, <u>Circuit Judges</u>.

Faced with the prospect of criminal indictment premised on the actions of two employees, a company demanded that those employees explain themselves under the threat of termination. They refused, and were fired. The ex-employees seek to recover certain employment benefits they lost by reason of termination. We agree with the summary judgment ruling of the United States District Court for the Southern District of New York (Oetken, <u>J</u>.) that the company had cause to fire the two employees for refusal to comply with its reasonable order, and did so.

Affirmed.

DAVID I. GREENBERGER (Jeffrey L. Liddle, Blaine H. Bortnick, James W. Halter, <u>on the brief</u>), Liddle & Robinson, LLP, New York, NY, <u>for Plaintiffs-Appellants</u>.

JONATHAN D. POLKES (Gregory Silbert, Nicholas J. Pappas, <u>on the brief</u>), Weil, Gotshal & Manges LLP, New York, NY, <u>for Defendants-Appellees Marsh</u>.

JAMES O. HEYWORTH (Andrew W. Stern, <u>on the brief</u>), Sidley Austin LLP, New York, NY, <u>for Defendant-Appellee Cherkasky</u>.

DENNIS JACOBS, Circuit Judge:

Faced with the prospect of criminal indictment premised on the actions of two employees, a company demanded that those employees explain themselves under the threat of termination. They refused, were fired, and in this suit seek to recover employment benefits they lost by termination. They appeal from the judgment of the United States District Court for the Southern District of New York (Oetken, J.), dismissing their complaint on summary judgment. We agree with the district court that the defendant company – Marsh (i.e., Marsh & McLennan Cos., Marsh Inc., Marsh USA Inc., and Marsh Global Broking Inc.) – had cause to fire William Gilman and Edward McNenney, Jr., for refusal to comply with its reasonable order. Accordingly, we affirm.[1]

## BACKGROUND

In April 2004, the New York Attorney General (the "AG") began investigating "contingent commission" arrangements by which insurance brokers

---

[1] We also affirm the district court's dismissal of Gilman and McNenney's claims for (i) abuse of process against Marsh and the CEO of Marsh, Michael Cherkasky, and (ii) misconduct against Cherkasky as an attorney, in a summary order filed simultaneously with this Opinion.

were thought to be steering clients to particular insurance carriers. Marsh, as one of the brokers under investigation, retained outside counsel, Davis Polk & Wardwell LLP, to conduct an internal investigation of the AG's allegations. The internal investigation included interviews with Gilman and McNenney in the spring and summer of 2004.

The focus of the AG investigation shifted, in September 2004, to an alleged bid-rigging scheme involving Marsh and several insurance carriers. On October 13, 2004, two individuals at American International Group, Inc. ("AIG") pleaded guilty to felony complaints charging them with participation in a bid-rigging scheme with Marsh. In the allocution of one of the AIG employees, Gilman and McNenney were identified as co-conspirators. The next day, the AG filed a civil complaint against Marsh for alleged fraudulent business practices and antitrust violations.

The fallout from the civil complaint was swift and severe. Marsh's stock price plunged, a raft of private civil suits were filed, and Marsh's directors, clients, and shareholders demanded answers to the bid-rigging allegations.

Marsh responded by expanding the ongoing internal investigation; on October 19, 2004, Marsh suspended Gilman and McNenney (with pay). More or less at the same time, Marsh's counsel asked Gilman and McNenney to sit for interviews and warned that failure to comply would result in termination. Gilman was asked to interview with a lawyer from Davis Polk as soon as possible. McNenney alleges that he was asked to submit to an interview with a lawyer from the AG and that he was told to do so without presence of counsel. (Marsh vigorously denies that McNenney was asked to interview with the AG, let alone to do so without counsel.)

On October 25, 2004, the CEO of Marsh's parent company resigned and was replaced by Michael Cherkasky. The same day, Cherkasky met with Eliot Spitzer, then-Attorney General of New York, to discuss the investigation. Gilman and McNenney contend that the upshot of the meeting was that the AG would forgo criminal prosecution of Marsh itself in exchange for its cooperation with the AG's investigation, including waivers of attorney-client privilege and work-product immunity for information developed in the (expanding) internal

investigation. That day, an AG press release announced that a civil proceeding would suffice to punish and reform Marsh, and that criminal prosecutions arising out of the alleged bid-rigging scheme would be limited to individuals. This press release was widely understood to mean the AG would indict Gilman and McNenney – as it eventually did.

By the time of the October 25 meeting and agreement between Cherkasky and Spitzer, neither Gilman nor McNenney had complied with Marsh's counsel's requests that they sit for interviews. On October 27, 2004, McNenney's attorney conveyed McNenney's refusal to Davis Polk; Marsh fired him the next day. On October 28, 2004, Gilman's attorney scheduled an interview for his client on November 2. But on November 1, 2004, Gilman submitted paperwork purporting to effectuate an early retirement; later that day, his attorney conveyed Gilman's refusal to be interviewed. Marsh fired Gilman the next day, and did not accept Gilman's purported retirement.

As Marsh employees, Gilman and McNenney were eligible for some valuable employment benefits. Under Marsh's Stock Award Plans, they received

grants of stock options, stock bonus units, and/or deferred stock units, some of which they could have been entitled to upon termination if (for example) they had retired or were fired without cause. If, however, they were terminated "for cause," any unvested stock benefits were forfeited. Under Marsh's ERISA-governed Severance Pay Plan, Gilman and McNenney were entitled to severance if, <u>inter alia</u>, they remained in good standing with Marsh on their last day of work and if their employment terminated (i) because they lacked job skills, or (ii) in connection with a restructuring, or (iii) because Marsh had eliminated their position. An otherwise-eligible employee whose employment was terminated "for cause" was not entitled to severance. Marsh took the position that it fired Gilman and McNenney "for cause," and denied them unvested, deferred compensation as well as severance.

As relevant here, Gilman and McNenney sued Marsh to obtain the lost employment benefits, alleging violations of ERISA, breach of contract, and breach of the implied covenant of good faith and fair dealing. The district court granted summary judgment in favor of Marsh, concluding that the interview requests

were reasonable, that Gilman's and McNenney's refusal to sit for interviews gave Marsh cause for termination, that Marsh did in fact fire them for cause (and did not breach the implied covenant), and that Gilman's purported retirement was ineffective. Gilman and McNenney appeal.

**DISCUSSION**

We review the grant of summary judgment de novo, construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. Noll v. Int'l Bus. Mach. Corp., 787 F.3d 89, 93-94 (2d Cir. 2015).

The first question is whether the demand that Gilman and McNenney submit to interviews was reasonable as a matter of law. If so, Marsh had cause to fire them and deny them employment benefits. If not, Gilman's and McNenney's claims against Marsh for benefits should have withstood summary judgment. We conclude that the interview demands were reasonable as a matter of law because at the time they were made, Gilman and McNenney were Marsh employees who had been implicated in an alleged criminal conspiracy for acts that were within

the scope of employment and that imperiled the company. The second question is whether there is a triable issue of fact as to whether Marsh fired them for cause. We conclude that there is not and reject the argument that Gilman and McNenny were let go routinely as part of a reduction in force and the argument that Gilman could not be fired because he had preemptively resigned. Finally, we reject Gilman's and McNenney's contention that, in light of Marsh's cooperation with the AG, Marsh's requirement that they answer potentially incriminating questions amounted to state action, and was thus unreasonable. Accordingly, Marsh had cause to fire them, as it did, and Gilman and McNenney are entitled to none of the employment benefits they seek.

**I**

Under Delaware law, which governs Marsh's employment contracts with Gilman and McNenney, "cause" for termination includes the refusal to "obey a direct, unequivocal, reasonable order of the employer." Unemployment Ins. Appeal Bd. v. Martin, 431 A.2d 1265, 1268 (Del. 1981). Gilman and McNenney do not dispute that Marsh's orders that they sit for interviews were direct and

unequivocal.  So the decisive issue is whether the orders were reasonable.

When Gilman and McNenney were named as co-conspirators in a criminal bid-rigging scheme for their conduct *as Marsh employees*, it was obvious (as Gilman and McNenney themselves affirmatively argue) that the AG intended to prosecute them criminally.  At that time, Marsh had sufficient basis to act on the allegations, made under oath in open court, and would have had cause to terminate Gilman and McNenney, regardless of the ultimate resolution of the allegations.  See Smallwood v. Allied Waste N. Am., Inc., 2010 WL 5556177, at *2 (Del. Super. Ct. Dec. 30, 2010) (holding that an employer had "just cause" to fire an employee for allegedly criminal conduct notwithstanding the employee's eventual acquittal on criminal charges).  "When an employer, because of an employee's wrongful conduct, can no longer place the necessary faith and trust in an employee, [the employer] is entitled to dismiss such employee without penalty."  Barisa v. Charitable Research Found., Inc., 287 A.2d 679, 682 (Del. Super. Ct. 1972); cf. Moeller v. Wilmington Sav. Fund Soc., 723 A.2d 1177, 1179 (Del. 1999) (concluding that, for purposes of claiming unemployment benefits, an

10

employer would have "just cause" to terminate employees if they had engaged in illegal or criminal conduct). If Marsh had indeed fired them then, it would have been for cause, and Gilman and McNenney would for that reason have been ineligible for the employment benefits they currently seek. It is difficult to see how their claims for benefits improved because Marsh instead gave them the chance to explain themselves, and they refused to comply.

Marsh was presumptively entitled to seek information from its own employees about suspicions of on-the-job criminal conduct. Marsh could take measures to protect its standing with investors, clients, employees, and regulators. Marsh also had a duty to its shareholders to investigate any potentially criminal conduct by its employees that could harm the company. See, e.g., In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 968-70 (Del. Ch. 1996). And as corporate officers, Gilman and McNenney had a duty to Marsh to disclose information they had about the AG's allegations. See, e.g., Beard Research, Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010).

Marsh's demands placed Gilman and McNenney in the tough position of choosing between employment and incrimination (assuming of course the truth of the allegations). But though Gilman and McNenney "may have possessed the personal rights to [not sit for interviews], that does not immunize [them] from all collateral consequences that come from [those] act[s]," including leaving Marsh "with no practical option other than to remove [them]." Hollinger Int'l, Inc. v. Black, 844 A.2d 1022, 1077 (Del. Ch. 2004). "[T]here would be a complete breakdown in the regulation of many areas of business if employers did not carry most of the load of keeping their employees in line and have the sanction of discharge for refusal to answer what is essential to that end." United States v. Solomon, 509 F.2d 863, 870 (2d Cir. 1975). Marsh had to use the "sanction of discharge for refusal to answer," id., because in the absence of an exculpatory explanation, Marsh needed to assume the worst: that the bid-rigging allegations were true and that Marsh was vicariously liable for their criminal conduct.

Gilman and McNenney argue that the October interview requests were unreasonable because Marsh had already interviewed them earlier in the year.

This is nonsense. In the spring and summer of 2004, the AG was investigating potential civil infractions involving insurance brokers steering clients to certain insurance carriers. Come September, however, the AG shifted focus to a criminal bid-rigging scheme. Then, in mid-October, Gilman and McNenney were named as co-conspirators in the criminal conspiracy and the AG filed a civil complaint against Marsh in which Gilman and McNenney were named. Circumstances had altered and stakes were raised. There is no reason to believe the October interviews would have been duplicative of the earlier interviews; and even if all Marsh sought was updated reassurance, the demand for interviews would have been reasonable. No doctrine limits a company's inquiries as to allegations of employee misconduct.

Gilman and McNenney also argue that the interviews were intended to produce incriminating evidence that Marsh could turn over to the AG to assist in the looming prosecution of Gilman and McNenney, and that Marsh did that as quid pro quo to save itself from criminal prosecution by the AG. But this argument ignores the incontestable fact that Marsh's interview requests *predated*

Cherkasky's October 25 meeting with Spitzer in which (Gilman and McNenney contend) the AG agreed not to prosecute Marsh, and Marsh agreed to waive attorney-client privilege and work-product immunity.

Given the circumstances, Marsh's demand that Gilman and McNenney explain themselves in an interview under the penalty of termination was unassailable, even routine. It did what any other company would do, and (arguably) what any company should do. Marsh's interview demands were reasonable and it had cause to fire Gilman and McNenney for refusing to comply.

## II

There is no genuine issue of material fact that Marsh fired Gilman and McNenney for their refusal to cooperate. It was objectively plain (and no witness has denied being aware) that the failure of Gilman or McNenney to comply with the interview requests would result in termination. Therefore, it was no surprise that each was fired the day after Marsh was notified of his refusal. Gilman and McNenney nevertheless posit that they may have been fired as part of a reduction-in-force or restructuring, which (if so) would entitle them to severance.

Gilman and McNenney fail to proffer evidence in support, and certainly create no triable issue of fact on this question.

Gilman also argues that he successfully pulled off what disgruntled employees eventually tell their employers: "You can't fire me; I quit." However, Delaware courts "read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract . . . meaningless or illusory." Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted). The definitions of "cause" in the Stock Award and Severance Plans would be rendered "meaningless or illusory" if an employee could preempt a known, imminent, for-cause termination with a voluntary retirement, and thereby reap all of the benefits of being a faithful employee.[2]

---

[2] The Severance Plan defines "cause" as including "insubordination," "willful misconduct," "failure to comply with [Marsh] policies or guidelines," and "commission of an act rising to the level of a crime." The Stock Award Plans governing stock bonus units and deferred stock units define "cause" as including "willful misconduct in the performance of the employee's duties," "continued failure after notice, or refusal, to perform the duties of the employee," "breach of fiduciary duty or breach of trust," and "any other action likely to bring substantial discredit to [Marsh]." To the extent this footnote (or any other record citation in this opinion) is drawn from the sealed appendix, the sealed material that is referenced is hereby deemed

15

There is no genuine dispute that Gilman filed his retirement papers in direct response to Marsh's (reasonable) interview request, or that Gilman would be fired immediately if he did not comply with Marsh's (reasonable) interview request. Marsh's internal investigators tried for weeks to schedule Gilman for an interview; they were finally able to pin him down for November 2; and just the day before, Gilman faxed retirement paperwork to Marsh. Coincidence is not that convenient.

For the same reasons, Gilman's and McNenney's argument that Marsh breached its duty of good faith and fair dealing also fails. Delaware law implies a "covenant of good faith and fair dealing" in every contract, which "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 441-42 (Del. 2005) (internal quotation marks omitted). But the conduct complained of here – Marsh's interview requests and subsequent termination of

unsealed.

16

their employment – was neither arbitrary, nor, as just discussed, unreasonable.

**III**

Gilman and McNenney argue that Marsh's interview demands constitute state action that infringed their right against self-incrimination. This is "the legal equivalent of the 'Hail Mary pass' in football." In re Lionel Corp., 722 F.2d 1063, 1072 (2d Cir. 1983) (Winter, J., dissenting). They advance the following argument: if Marsh's request that Gilman and McNenney sit for interviews under the penalty of termination is deemed state action (because of Marsh's cooperation with the AG), and if that demand and threat violated their Fifth Amendment right, then Marsh's request was unreasonable as a matter of law, and their refusal to comply with the interview demands cannot support their loss of benefits.

The claim that Marsh was a state actor leans heavily on United States v. Stein, 541 F.3d 130 (2d Cir. 2008); but Stein cannot support that weight. In Stein, federal prosecutors were investigating potential criminal conduct by employees of the accounting firm KPMG. Under a longstanding policy, the firm was bound

17

to pay the legal defense bills of its employees, and it was willingly doing so. During its discussions with prosecutors, KPMG got the unsubtle message that, if it wished to avoid its own indictment, it would have to adopt a new Fees Policy and stop paying for its employees' defense. We upheld the district court's finding of fact that this change was "a direct consequence of the government's overwhelming influence," id. at 136, which would not have happened "but for" the prosecutors' conduct, id. at 144. In effect and in fact, the prosecution arranged to strip criminal defendants of their chosen counsel by stopping at the source the defense fees to which defendants were entitled by contract from an employer willing to pay. The government's influence in Stein was "overwhelming" in several respects: KPMG's "survival depended on its role in a joint project with the government to advance government prosecutions," id. at 147; "the government forced KPMG to adopt its constricted Fees Policy," id. at 148; the government "intervened in KPMG's decisionmaking," id.; the prosecutors "steered KPMG toward their preferred fee advancement policy and then supervised its application in individual cases," id; and "absent the prosecutors' involvement . . .

KPMG would not have changed its longstanding fee advancement policy," id. at 150. Since the government steered KPMG to adopt a policy it otherwise would not have adopted, and then supervised KPMG's implementation of that policy, KPMG's conduct was found to constitute state action.

Stein has no bearing on this case. Marsh had good institutional reasons for requiring Gilman and McNenney to sit for interviews or else lose their jobs: the company's stock price was sinking and its clients, directors, investors, and regulators were demanding answers about the allegations. There is no evidence that the AG "forced" Marsh to demand interviews, "intervened" in Marsh's decisionmaking, "steered" Marsh to request interviews, or "supervised" the interview requests. Nor is there evidence that the nature and scope of the pending interviews were framed by the government, or changed after Cherkasky's October 25 meeting with Spitzer. The expansion of Marsh's internal investigation was precipitated by allegations advanced by the government, but it is not a measure it would have forgone "but for" the AG's influence.

Even if, as McNenney contends, Davis Polk sought to interview him without counsel and with the AG present, that request occurred well before October 25, and McNenney adduced no evidence that Marsh's request for an interview arose out of pressure or coercion from the AG. And Marsh, which already had cause to fire McNenney, could presumably put additional conditions on its interview request anyway, as it still gave McNenney fundamentally the same choice to explain himself or be fired.

Gilman and McNenney invite us to consider that the occasion for the corporate investigation was a criminal initiative by government, and that a likely use of the internal investigation was that Marsh would offer up its findings (together with the employees' testimony) in the nature of a sacrifice to an angry prosecutor. No doubt, Marsh was compelled by circumstances to conduct an investigation (with expectation that any privileges attached to it would be waived) and that one mighty circumstance was a possible prosecution of the firm. But in the ordinary course, allegations of serious wrongdoing would provoke such an investigation, whether or not the allegations were made by prosecutors

20

and whether or not the company itself was at risk of prosecution. The interests of prudent directors alone would justify or compel such a measure. Stein is properly distinguished because (among other things) KPMG had no institutional interest in stripping its employees of their chosen defense counsel and KPMG was forced to abandon a longstanding policy that it had decided to continue; it was therefore found that government compulsion was the "but for" reason for the new Fees Policy.

This is not a Stein case. This case is more nearly an analog of D.L. Cromwell Investments, Inc., v. NASD Regulation, Inc., 279 F.3d 155 (2d Cir. 2002), in which the government and a private actor, NASD, simultaneously investigated certain stockbrokers for suspected criminal activity. The stockbrokers argued that the Fifth Amendment protected them from complying with NASD's demand for on-the-record interviews (made on the pain of expulsion from their profession) because NASD had become a state actor. As Stein recognized, the holding of D.L. Cromwell is that there was no state action because NASD "had independent regulatory interests and motives for making [its] inquiries and for cooperating

with [a] parallel investigation[] being conducted by the government." Stein, 541 F.3d at 150. That is, "[NASD] would have requested interviews regardless of governmental pressure." Id. We arrived at this conclusion notwithstanding "informal and formal sharing of documents and information between the government and the NASD" and "the fact that the NASD interview demands followed shortly after [the stockbrokers] contested grand jury subpoenas." Id.

Gilman and McNenney urge that we adopt, in effect, this categorical rule: acts that are taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action. But a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation and for cooperating with a governmental investigation, even when employees suspected of crime end up jettisoned. A rule that deems all such companies to be government actors would be incompatible with corporate governance and modern regulation. See Solomon, 509 F.2d at 870.

# CONCLUSION

For the foregoing reasons, we affirm.